# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | |
|---|---|
| **KIESHA C. KINCER,** ) | |
| Plaintiff ) | |
| v. ) | Civil Action No. 2:13cv00025 |
| ) | **MEMORANDUM OPINION** |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner of** ) | |
| **Social Security,** ) | By:   PAMELA MEADE SARGENT |
| Defendant ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Kiesha C. Kincer, ("Kincer"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by transfer based on consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Oral argument has not been requested, therefore, the matter is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a

particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Kincer protectively filed her applications for SSI and DIB on November 6, 2008, alleging disability as of February 21, 2008, due to a neck and back injury, anxiety with tremors, headaches and depression. (Record ("R."), at 12, 219-20, 221-23, 233, 267.) The claims were denied initially and upon reconsideration. (R. at 56-79, 82-111, 140, 141-43, 145-50, 152-54.) Kincer then requested a hearing before an administrative law judge, ("ALJ"). (R. at 155-56.) A videoconference hearing was held on Kincer's claims on December 13, 2011. (R. at 28-55.) Kincer was represented by counsel at this hearing. (R. at 28.)

By decision dated January 10, 2012, the ALJ denied Kincer's claims. (R. at 12-22.) The ALJ found that Kincer met the disability insured status requirements of the Act for DIB purposes through June 30, 2014. (R. at 12, 14.) The ALJ found that Kincer had not engaged in substantial gainful activity since February 21, 2008, the alleged onset date. (R. at 14.) The ALJ found that the medical evidence established that Kincer had severe impairments, namely fibromyalgia/arthralgias, degenerative disc disease of the cervical spine, headaches, depression, anxiety and a personality disorder, but the ALJ found that Kincer did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15.) The ALJ

found that Kincer had the residual functional capacity to perform light work[1] that did not require her to climb ladders, ropes or scaffolds or crawl, to be exposed to unprotected heights or moving machinery or concentrated exposure to excessive noise or excessive vibrations or more than occasionally climbing ramps or stairs, balancing, stooping, kneeling or crouching. (R. at 16-20.) The ALJ also found that Kincer was limited to simple, routine, repetitive unskilled tasks with no more than occasional interaction with the public, co-workers or supervisors. (R. at 16-20.) The ALJ found that Kincer had no past relevant work. (R. at 20.) Based on Kincer's age, education, work experience, residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Kincer could perform, including jobs as a general office clerk, an order clerk and an office messenger. (R. at 20-21.) Thus, the ALJ concluded that Kincer was not under a disability as defined by the Act and was not eligible for DIB or SSI benefits. (R. at 21.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2013).

After the ALJ issued his decision, Kincer pursued her administrative appeals, but the Appeals Council denied her request for review. (R. at 1-5, 7.) Kincer then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2013). The case is before this court on Kincer's motion for summary judgment filed January 15, 2014, and the Commissioner's motion for summary judgment filed April 21, 2014.

---

[1] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2013).

## II. Facts and Analysis

Kincer was born in 1978, (R. at 56), which, at the time of the ALJ's decision, classified her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Kincer graduated from high school and attended two years of college. (R. at 240.) In rendering his decision, the ALJ reviewed records from Wise Resident's Clinic; Wise Medical Group Health Care; Dr. Michael Moore, M.D.; Norton Community Hospital; Dickenson Clinic; Mountain View Regional Medical Center; Dr. Kevin Blackwell, D.O.; Wise County Behavioral Health Services; Blue Ridge Neuroscience Center; Richard J. Milan Jr., Ph.D., a state agency psychologist; B. Wayne Lanthorn, Ph.D.; Frontier Health Assessment and Forensic Services; Julie Jennings, Ph.D., a state agency psychologist; Dr. Richard Surrusco, M.D., a state agency physician; Dr. Galileo Molina, M.D.; Dr. Erin Mullins, M.D., with Norwise, OB-GYN; Dr. Uzma Ehtesham, M.D., a psychiatrist; and Dr. Thomas Phillips, M.D., a state agency physician. Kincer's attorney also submitted medical reports from Dr. Moore to the Appeals Council.[2]

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2013). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§

---

[2] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 1-5), this court must also take these new findings into account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991).

404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2013).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011 & West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated January 10, 2012, the ALJ denied Kincer's claims. (R. at 12-22.) The ALJ found that the medical evidence established that Kincer had severe impairments, namely fibromyalgia/arthralgias, degenerative disc disease of the cervical spine, headaches, depression, anxiety and a personality disorder, but the ALJ found that Kincer did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15.) The ALJ found that Kincer had the residual functional capacity to perform light work that did not require her to climb ladders, ropes or scaffolds or crawl, to be exposed to unprotected heights or moving machinery or concentrated exposure to excessive noise or excessive vibrations or more than occasionally climbing ramps or stairs, balancing, stooping, kneeling or crouching. (R. at 16-20.) The ALJ also found that Kincer was limited

to simple, routine, repetitive unskilled tasks with no more than occasional interaction with the public, co-workers or supervisors. (R. at 16-20.) The ALJ found that Kincer had no past relevant work. (R. at 20.) Based on Kincer's age, education, work experience, residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Kincer could perform, including jobs as a general office clerk, an order clerk and an office messenger. (R. at 20-21.) Thus, the ALJ concluded that Kincer was not under a disability as defined by the Act and was not eligible for DIB or SSI benefits. (R. at 21.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

In her brief, Kincer argues that the ALJ's finding that she was not disabled is not supported by substantial evidence. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-8.) In particular, Kincer argues that the ALJ erred by making incomplete findings at step three of the sequential process. (Plaintiff's Brief at 5-6.) Kincer also argues that substantial evidence does not exist in the record to support the ALJ's findings as to her residual functional capacity. (Plaintiff's Brief at 6-8.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the

-6-

Case 2:13-cv-00025-PMS   Document 23   Filed 09/30/14   Page 6 of 19   Pageid#: 921

ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975.) Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(c), 416.927(c), if he sufficiently explains his rationale and if the record supports his findings.

I will first address Kincer's argument that the ALJ erred by making incomplete findings at step three of the sequential process. In particular, Kincer argues that the ALJ erred in his analysis of whether her condition met a listed mental impairment. The ALJ's decision states that he considered whether Kincer's mental condition met or equaled the listed impairments for affective disorders, Section 12.04, or anxiety related disorders, Section 12.06. (R. at 15.) The ALJ further considered whether Kincer's condition satisfied the "paragraph B" criteria for these listed impairments. (R. at 15-16.) To meet the "paragraph B" criteria, a claimant's mental impairment must result in two of the following: marked restrictions of activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence or pace or repeated episodes of decompensation, each of extended duration. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04, 12.06. The ALJ found that Kincer experienced mild limitations in activities of daily living based on Kincer's statements as to her

daily activities. (R. at 16.) The ALJ also found that Kincer experienced moderate difficulties in social functioning and maintaining concentration, persistence or pace, but he did not cite any of the evidence of record to support or explain his findings. (R. at 16.) Kincer argues that this failure warrants reversal or, in the alternative, remand for further consideration.

A closer review of the ALJ's opinion, however, shows that, while he did not weigh the psychological evidence of record at that particular point in his decision, he did recite the evidence of record and explain the weight he gave that evidence. (R. at 17-20.) In particular, the ALJ stated that he was giving limited weight to Dr. Ehtesham's opinions because his findings were inconsistent with the claimant's activities of daily living, the objective findings of the consultative examiners and other objective evidence and because Dr. Ehtesham only evaluated Kincer on one occasion. (R. at 19.) Based on my review of the ALJ's opinion and the record, I find that the ALJ adequately explained his weighing of the psychological evidence and that substantial evidence supports his weighing and his findings as to Kincer's mental residual functional capacity.

The record shows that in April 2009 the Department of Social Services removed Kincer's child from her home, and Kincer was ordered by Social Services to participate in a therapy group at Wise County Behavioral Health. (R. at 509-31.) Upon intake, Kincer denied a history of substance abuse, but the notes reflect that her youngest child, who later died, had been born with opiates in her system. (R. at 509.) Kincer stated that she had worked as a waitress for about eight years, but she was then happy to be able to be a full-time mother; Kincer did not claim that she was disabled from working. (R. at 512.) The intake notes also stated that Kincer was able to complete all activities of daily living and independent living with no

intervention. (R. at 514.) A checklist of Kincer's then-current psychological symptoms indicated that she suffered from no symptoms other than mild academic or work inhibition, social withdrawal, jitteriness, recurrent recollection of distressing events, depressed mood, excessive or inappropriate guilt, excitability, feeling worthless, helplessness, hopelessness and hostility and moderate anxiety, panic attacks, worrying and insomnia. (R. at 518-20.) Kincer was diagnosed with opioid intoxication and assessed with a then-current Global Assessment of Functioning, ("GAF"), score of 60.[3] (R. at 521.) A GAF score of 51-60 indicates that the individual has moderate symptoms or moderate difficulty in social, occupational or school functioning. *See* DSM-IV at 32.

On April 28, 2008, Dr. Ehtesham completed an assessment of Kincer's psychological condition. (R. at 570-75.) Dr. Ehtesham noted that Kincer presented with complaints of agitation, excessive worry, fatigue, irritability, restlessness, poor concentration, sleep disturbance, trembling, sweating, shortness of breath, chest pain, sadness, fatigue, low self-esteem, hopelessness and property destruction. (R. at 570.) Kincer complained of severe mood swings, crying and feeling sad. (R. at 570.) Kincer stated that her symptoms of depression started five years previously. (R. at 571.) Dr. Ehtesham's assessment did not address any prior history of substance abuse by Kincer. (R. at 571.) On Dr. Ehtesham's mental status exam, it was noted that Kincer avoided eye contact and exhibited normal motor activity, but her affect was anxious and labile. (R. at 573.) Dr. Ehtesham noted that Kincer denied any suicidal or homicidal ideations, no delusions were elicited, there was no evidence of mania, and she did not appear to be responding to internal

---

[3] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

stimuli. (R. at 573.) Dr. Ehtesham noted that Kincer's thought processes were goal-oriented, her insight was good, and her judgment was intact. (R. at 573.) Dr. Ehtesham diagnosed Kincer with a generalized anxiety disorder and major depressive disorder and prescribed Lexapro and Vistaril. (R. at 575.) Dr. Ehtesham placed Kincer's then-current GAF score at 60. (R. at 575.)

About a year and a half later, on September 18, 2009, Dr. Ehtesham completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental), stating that Kincer was permanently disabled. (R. at 584-86.) Dr. Ehtesham stated that Kincer had no useful ability to carry out simple or complex instructions, to make judgments on simple or complex work-related decisions, to interact appropriately with the public, supervisors or co-workers or to respond appropriately to usual work situations and changes in a routine work setting. (R. at 584-85.) Dr. Ehtesham also stated that Kincer had an unsatisfactory ability to understand and remember simple and complex instructions. (R. at 584.) In response to a request on this form to identify the factors (e.g., the particular medical signs, laboratory findings or other factors) that supported her assessment, Dr. Ehtesham stated "none." (R. at 585.)

The medical records also show that Kincer was treated at Dickenson Clinic for depression and anxiety in 2008. (R. at 358-61, 364.) Kincer was treated with Effexor. (R. at 358-61.)

A January 11, 2007, note from Norwise Ob-Gyn states that an anonymous caller reported that Kincer was using marijuana and other street drugs during her first pregnancy. (R. at 627.) These records also include the results of a drug screen collected on January 15, 2007, which tested negative for drug use. (R. at 638.) A

March 6, 2008, note from Norwise Ob-Gyn states that a provider spoke with Kincer about a positive urine drug screen, and Kincer stated that she had been taking hydrocodone since being injured in a motor vehicle accident a couple of years previous. (R. at 618.) On June 24, 2008, Kincer was seen at Norwise Ob-Gyn for a post-partum visit. (R. at 607.) The note by Dr. Erin Mullins, M.D., states that Kincer denied suffering from any depression at that time. (R. at 607.)

On June 29, 2009, Richard J. Milan, Jr., Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on Kincer.[4] (R. at 61-62.) Milan specifically considered whether Kincer's impairment met or equaled the listed impairments for affective disorders, found at § 12.04, anxiety-related disorders, found at § 12.06, or substance addiction disorder, found at § 12.09. (R. at 61.) He found that there was a medically determinable impairment present, but that it did not precisely satisfy the diagnostic criteria for these listed impairments. (R. at 61.) Milan stated that Kincer experienced mild restrictions of activities of daily living, mild difficulties in maintaining social functioning and mild difficulties in maintaining concentration, persistence or pace and no repeated episodes of decompensation of extended duration. (R. at 61.)

A urine drug screen performed on Kincer at Norton Community Hospital on November 18, 2009, tested positive for the use of benzodiazepines and opiates. (R. at 653.) On that same date, Dr. Mullins with Norwise Ob-Gyn, noted that Kincer was addicted to Lortab and Xanax, but refused treatment and continued to take the medications despite being pregnant. (R. at 603.) A urine drug screen at the same facility on January 8, 2010, again tested positive for benzodiazepines and opiates.

---

[4] The only evidence of this contained in the Record is found in the Initial Disability Determination Explanation. (R. at 61-62, 73-74.)

(R. at 657.) Dr. Mullins noted her continued use on that date as well. (R. at 603.) In an undated medical history completed for Tru-Care Medical Clinic, ("Tru-Care"), Kincer stated that she had used LSD or hallucinogens and marijuana on one occasion in the past. (R. at 672.) She also stated that she had taken stimulants and tranquilizers or sleeping pills routinely in the past. (R. at 673.) Kincer also stated that she was taking pain killers "a lot, all day." (R. at 672.) On February 16, 2010, Kincer told Dr. Virginia A. Baluyot, M.D., with Tru-Care that she had been abusing pain medication and Xanax since she was in a motor vehicle accident in 2003. (R. at 676.) In particular, Kincer said that she had crushed and snorted an average of 10 Percocet, Roxicet or OxyContin tablets a day. (R. at 676.) Kincer entered Subutex treatment for opiate addiction in February 2010. (R. at 677-99, 730-41.) She was pregnant at the time. (R. at 695.) Nonetheless, on March 18, 2010, Kincer admitted that she had used Percocet two days previous. (R. at 689.) The evidence shows that Kincer had returned to the use of Lortab and Xanax by October 2011. (R. at 744.)

In April 2010, Elizabeth Jones, M.A., a senior psychological examiner, performed a psychological evaluation on Kincer. (R. at 701-06.) Jones noted that Kincer was pregnant with her third child, which was due in July. (R. at 701.) Jones noted that Kincer's grooming and hygiene were excellent, her affect was bright with congruent mood, and she was cooperative. (R. at 702.) Jones stated that Kincer did not appear to have memory problems, and she had no difficulty with attention or concentration. (R. at 703.) Although Kincer claimed that she experienced tremors due to anxiety, Jones noted that Kincer's hands did not shake during the interview other than when she held them up to show Jones how they would shake. (R. at 704.) Kincer denied delusions and hallucinations, and Jones said that there was no evidence of any disordered thought process. (R at 704.)

-12-

Case 2:13-cv-00025-PMS   Document 23   Filed 09/30/14   Page 12 of 19   Pageid#: 927

Jones said that Kincer appeared to be functioning in the average range of intelligence. (R. at 704.)

Kincer told Jones that she was applying for disability because she had "issues with [her] neck and back." (R. at 702.) Kincer also said that she had suffered from "nerve problems since high school." (R. at 702.) Kincer said that she was put on antidepressants in July 2008 after her infant daughter died. (R. at 702.) Kincer told Jones that she currently was in Subutex treatment, but she stated, "It really sucks but I have to do it for my baby." (R. at 702.) Regarding her history of substance abuse, Kincer stated, "One drug led to another. I went to college and experimented with alcohol and marijuana. I did pills and cocaine but never IV drugs. Seven years ago in 2003 I was in a car accident and was taking [m]orphine. I didn't know what the hell I was doing. I ended up buying it." (R. at 702.) Kincer also told Jones, "I [have] been arrested for all kinds of things." (R. at 702-03.) Kincer told Jones that she last worked as a waitress in 2008. (R. at 703.) Kincer stated that she could not keep a job. (R. at 703.) When asked why, Kincer replied, "I don't know. I get fired. I just get into it with the other girls." (R. at 703.)

Kincer complained of sleep difficulties due to pain, low appetite and low energy level. (R. at 704.) Jones stated that Kincer had no difficulty relating to her and should have no difficulty relating to others. (R. at 705.) Jones stated that Kincer displayed significant symptoms of a personality disorder. (R. at 705.)

Jones assessed Kincer's then-current GAF score at 70, which indicates mild symptoms and/or functional limitations. (R. at 706.) *See* DSM-IV at 32. Jones also stated that Kincer was not limited in her ability to understand and remember and should be able to understand and remember simple and detailed instructions and

-13-

was not limited in her ability to make work-related decisions. (R. at 706.) Jones did state that Kincer did have mild limitations in social interaction and adaptation, she displayed poor judgment and impulsivity and that she might have difficulty responding appropriately to criticism from supervisors. (R. at 706.) Jones diagnosed opioid dependence; anxiety disorder, not otherwise specified, and personality disorder, not otherwise specified, with borderline and histrionic features. (R. at 706.)

Kincer's family doctor, Dr. R. Michael Moore, M.D., completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) on December 19, 2011. (R. at 821-23.) Dr. Moore stated that Kincer had poor or no ability to making all occupational, performance and personal/social adjustments except for a seriously limited ability resulting in unsatisfactory work performance to follow work rules, to function independently, to maintain attention/concentration, to understand, remember and carry out simple job instructions, to maintain personal appearance and to behave in an emotionally stable manner. (R. at 821-22.) Dr. Moore also stated that Kincer would be absent from work more than two days a month due to her mental impairments or treatment. (R. at 823.)

On April 29, 2010, Julie Jennings, Ph.D., a state agency psychiatrist, completed a Psychiatric Review Technique form ("PRTF"), on Kincer.[5] (R. at 90-91.) Jennings specifically considered whether Kincer's impairment met or equaled the listed impairments for affective disorders, found at § 12.04, anxiety-related disorders, found at § 12.06, or substance addiction disorders, found at § 12.09. (R. at 90.) She found that there was a medically determinable impairment present, but

---

[5] The only evidence of this contained in the Record is found in the Initial Disability Determination Explanation and on reconsideration. (R. at 90-91, 105-06.)

that it did not precisely satisfy the diagnostic criteria for these listed impairments. (R. at 90.) Jennings stated that Kincer experienced no restrictions of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace and no repeated episodes of decompensation of extended duration. (R. at 90.) Jennings stated that Kincer did not suffer from a severe mental impairment. (R. at 91.)

Based on the above evidence, I find that substantial evidence supports the ALJ's findings that Kincer's mental impairments did not meet or equal a listed impairment. I also find that substantial evidence exists in the record to support the ALJ's rejection of Dr. Ehtesham's extreme findings. I further find that the ALJ's finding as to Kincer's mental residual functional capacity is supported by the above evidence.

I also find that substantial evidence supports the ALJ's finding at to Kincer's physical residual functional capacity. In particular, Kincer argues that the ALJ erred in rejecting the opinion of her treating physician, Dr. Moore, regarding her residual functional capacity. Based on my review of the record, I find that substantial evidence supports the rejection of the opinions of Dr. Moore. Dr. Moore's assessment of Kincer's mental residual functional capacity, summarized above, basically found that Kincer had no work-related mental abilities. Dr. Moore's assessment of Kincer's physical residual functional capacity is almost as extreme. Dr. Moore stated that Kincer could lift and carry items weighing up to only five pounds occasionally. (R. at 818.) He stated that she could stand and/or walk for only two hours and sit for only three hours in an eight-hour workday. (R. at 818-19.) Dr. Moore also stated that Kincer could never climb, stoop, kneel, balance, crouch or crawl. (R. at 819.)

While the medical record shows that Dr. Moore treated Kincer from May 6, 2008, to June 29, 2009, each medical report is sparse and, often, illegible. (R. at 456-59, 578-79, 810-23.) From the medical records, it appears that Dr. Moore treated Kincer primarily for complaints of low back and neck pain and feeling nervous. (R. at 456-59, 478-79.) Other than documenting some muscle tenderness, Dr. Moore's reports contain few, if any, mention of supporting findings. Dr. Moore routinely prescribed Xanax and Lortab for Kincer's complaints. (R. at 456-59, 478-79.) On June 23, 2008, Kincer requested a prescription for Adderall, which Dr. Moore did not write. (R. at 458.)

Dr. Moore did refer Kincer to see a Dr. Rebekah C. Austin, M.D., a neurosurgeon with Blue Ridge Neuroscience Center on May 11, 2009. (R. at 487-90.) Kincer told Dr. Austin that she had suffered a cervical strain in a motor vehicle accident on September 30, 2008, and that her cervical difficulties had worsened since that time. (R. at 487.) She also complained of persistent low back pain. (R. at 487.) Dr. Austin's musculoskeletal examination showed mild cervical paraspinous muscle contractions with tenderness of the cervical spine. (R. at 488.) Range of motion of the neck was limited in left rotation to 60 degrees and right rotation to 60 degrees with increase in pain. (R. at 488.) There was no misalignment, asymmetry, crepitation, tenderness, masses, deformities or effusions and no limitation in the range of motion in the upper or lower extremities. (R. at 488.) Straight leg raise was negative bilaterally. (R. at 488.) Muscle tone was normal with no evidence of any atrophy. (R. at 489.) Dr. Austin stated that an MRI of Kincer's cervical spine taken on November 18, 2008, revealed cervical disc degeneration and a broad-based disc protrusion at the C5-C6 level. (R. at 489.)

After reviewing Kincer's medical records and radiographic images and examining Kincer, Dr. Austin stated that Kincer complained of diffuse musculoskeletal pain with no clearcut evidence of radiculopathy on exam. (R. at 489.) She recommended maximizing conservative treatment. (R. at 489.) Dr. Austin stated that she did not believe that surgical intervention was warranted or would significantly improve her condition. (R. at 489.) Dr. Austin did prescribe a course of physical therapy, but there is no indication in this record that Kincer ever attended physical therapy other than in 2003. (R. at 329-31, 333-37, 490.) Regarding Kincer's work, Dr. Austin simply stated "patient does not work outside of the home." (R. at 490.)

The medical record also shows that Kincer treated with Dr. Galileo Molina, M.D., beginning in 2007 to 2008 for neck and back pain. (R. at 379-83.) At Dr. Molina's initial assessment, Kincer stated that she had suffered from chronic neck pain since injuring her neck in a motor vehicle accident in 2003. (R. at 382.) Kincer complained of a pain level of 10 on a 10-point scale, but Dr. Molina noted that Kincer moved her neck in all directions with no apparent pain or difficulty and did not appear to be in pain. (R. at 382.) Kincer also complained of suffering from chronic low back pain her entire life. (R. at 382.) Dr. Molina ordered x-rays and gave Kincer a prescription for Anabar. (R. at 382.) Dr. Molina noted that when Kincer looked at the prescription "she had a sour expression on her face and asked 'what is this[?]'" (R. at 382.)

Dr. Kevin Blackwell, D.O., performed a consultative examination of Kincer on May 18, 2009. (R. at 504-07.) Kincer complained of neck and back pain so severe that she could not sleep or sit for any period of time. (R. at 504.) Kincer also complained of arthritis pain in most of her joints. (R. at 504.) Kincer told Dr.

Blackwell that her pain was a 7-8 on a 10-point scale on a good day and a 9-10 on a bad day. (R. at 504.) She also stated that she had problems with anxiety and depression. (R. at 504.)

Physical examination revealed some tenderness in Kincer's knees and in her trapezius and lumbar muscles. (R. at 506.) All other findings were normal, including good grip strength, normal upper and lower extremity strength and reflexes. (R. at 506.) Dr. Blackwell diagnosed chronic cervical/lumbar pain, anxiety/depression, bilateral knee pain and headaches secondary to chronic cervical pain. (R. at 506.) Dr. Blackwell stated that Kincer was capable of lifting items weighing up to 35 pounds maximally and 20 pounds frequently. (R. at 506.) He stated that Kincer could bend at the waist and kneel up to one-third of the day.(R. at 506.) He stated that Kincer could not squat, crawl, climb ladders or work at unprotected heights. (R. at 506-07.) Dr. Blackwell stated that Kincer could sit for eight hours in an eight-hour workday and stand for eight hours with normal postural changes. (R. at 507.)

Dr. Thomas M. Phillips, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment on Kincer on June 22, 2009. (R. at 63-64.)[6] Dr. Phillips stated that Kincer could occasionally lift and carry items weighing up to 20 pounds and frequently lift and carry items weighing up to 10 pounds. (R. at 63.) He stated that Kincer could stand and/or walk up to six hours in an eight-hour workday and sit about six hours in an eight-hour workday. (R. at 63.) Dr. Phillips stated that Kincer could never climb ladders, ropes or scaffolds,

---

[6] The only evidence of this contained in the Record is found in the Initial Disability Determination Explanation. (R. at 63-64.)

but could occasionally climb ramps or stairs, stoop, kneel, crouch and crawl and could frequently balance. (R. at 63-64.)

Dr. Richard Surrusco, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment on Kincer on April 29, 2010. (R. at 92-93.)[7] Dr. Surrusco stated that Kincer could occasionally lift and carry items weighing up to 50 pounds and frequently lift and carry items weighing up to 25 pounds. (R. at 92.) He stated that Kincer could stand and/or walk up to six hours in an eight-hour workday and sit about six hours in an eight-hour workday. (R. at 92.) Dr. Surrusco stated that Kincer could occasionally climb ladders, ropes or scaffolds, climb ramps or stairs, balance, stoop, kneel, crouch and crawl. (R. at 93.)

Based on this evidence, I find that the ALJ did not err in rejecting the opinions of Dr. Moore. I further find that this evidence supports the ALJ's finding as to Kincer's physical residual functional capacity and his decision that she was not disabled. An appropriate order and judgment will be entered.

ENTERED: September 30, 2014.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

---

[7] The only evidence of this contained in the Record is found in the Disability Determination Explanation on reconsideration. (R. at 92-93.)